**UNITED STATES of America,
Appellant,**

**v.**

**Toyin OYEKAN and Eniten Keleni,
a/k/a Eniten Kelani, Appellees.**

**No. 85–1775.**

United States Court of Appeals,
Eighth Circuit.

Submitted Nov. 15, 1985.

Decided March 18, 1986.

Steven A. Muchnick, Asst. U.S. Atty., for appellant.

Debra J. Gentsch, St. Louis, Mo. and Paul M. Stormant, Jr., Belleville, Ill., for appellees.

Before LAY, Chief Judge, HENLEY, Senior Circuit Judge, and JOHN R. GIBSON, Circuit Judge.

LAY, Chief Judge.

Toyin Oyekan and Eniten Keleni,[1] both Nigerian citizens, arrived on a flight from London at Lambert International Airport in St. Louis on October 16, 1984 at approximately 1:30 p.m. Since this was their entry point into the United States, both women presented their passenger declarations, passports and luggage to the customs inspector and were submitted to routine questioning. Ordinary customs procedures permit further questioning and luggage examination if the initial inspector observes anything "unusual" about a traveler. In Oyekan's case, the inspector pursued further questioning based upon the small amount of luggage she carried, the short time she planned to spend in the United States, that she was from Nigeria (com-

---

1. Eniten Keleni's last name is spelled "Kelani" on her customs declaration, airplane ticket, passport and hospital consent forms. Since her counsel has consistently spelled her last name "Keleni," though, we will use that spelling here.

monly a source of drugs), and that she had paid for her ticket in cash. Keleni was also held for further inspection because she was apparently travelling alone, had little luggage and anticipated a short stay.

The women's responses to further questioning by a second customs official aroused even greater suspicion. Oyekan stated that the purpose of her trip was to buy cosmetics, that she intended to stay for about a week, and that she had no family or friends in St. Louis. Oyekan had $900.00 in cash with her. Keleni gave a similar account of her plans. She too said she was in the United States to make some purchases, was planning on staying for about a week, and that she knew no one in St. Louis. Keleni said she had $800.00 to spend. Both defendants denied they knew each other and insisted that they were traveling alone, but the women's customs declaration cards indicated that they both would be staying at the "Ramadan" Hotel. In the customs officer's opinion, both women exhibited sufficient "drug courier profile"[2] characteristics to justify further investigation.

The women were then taken to private investigation rooms where they were patted down and strip searched in the presence of a female customs official. No illegal drugs were discovered either on their bodies or in their clothing. The women's purses and luggage were next examined. Keleni had eight $100 bills in her purse; six of them had consecutive serial numbers. Oyekan had nine $100 bills and four of the bills had serial numbers within ten numbers of Keleni's bills. Moreover, their airline tickets had consecutive serial numbers. The defendants also gave implausible and inconsistent answers to questions about their travel plans and the purpose of their trip.

One of the agents then told Keleni that she was suspected of carrying drugs inside her body, an accusation Keleni denied. The agent informed Keleni that an x-ray

could determine whether she was smuggling drugs in that manner and that the procedure could be performed by a doctor in a hospital. She was assured that if the exam revealed nothing that she would be driven to her hotel and released. She was cautioned, though, that she did not have to take the x-ray. Keleni then agreed to the x-ray if it would clear up the matter. Oyekan was given the same information. She initially hesitated and said, "this is terrible," but agreed to go along if the x-ray would resolve the situation.

The two women were driven to a hospital, where Oyekan and Keleni were questioned by hospital personnel about sensitivities which might render the procedure dangerous. They were also asked to sign consent and release forms, which they did, authorizing the hospital to perform x-rays, rectal and pelvic examinations and to provide the results to the customs officials. Two sets of x-rays were then administered to each woman, revealing that Keleni had four abnormal objects in her abdomen, and that Oyekan had six such objects in her abdomen. The pair were then arrested and advised of their *Miranda* rights.

Oyekan thereafter submitted to a rectal examination which produced a packet containing heroin. A pelvic examination revealed no evidence that Oyekan was carrying drugs in her vagina. Oyekan then passed five more packets naturally. Keleni passed four packets naturally, but was then also given pelvic and rectal exams to determine if there were any packets remaining inside her body. No other packets were discovered by those procedures.

Oyekan and Keleni were each charged with facilitating transportation of imported merchandise contrary to law, possession of heroin with intent to distribute, importation of heroin, and conspiracy to possess with intent to distribute heroin, in violation of 18 U.S.C. § 545, 21 U.S.C. § 841(a)(1), 21 U.S.C. § 952(a) and 21 U.S.C. § 846 respectively. The defendants moved the district

---

**2.** The "drug courier profile" is an "abstract of characteristics found to be typical of persons transporting illegal drugs." *Florida v. Royer,*

460 U.S. 491, 493 n. 2, 103 S.Ct. 1319, 1322 n. 2, 75 L.Ed.2d 229 (1983).

court[3] for an order suppressing the seized heroin and the x-rays on the grounds that this evidence was obtained in violation of the defendants' fourth amendment rights, that their consent to the x-ray was insufficient to validate the procedure, and that they had been advised of their *Miranda* rights in an untimely fashion.

The district court agreed and suppressed the evidence seized. The court first held that the defendants' consent to the x-ray and physical examinations was neither knowingly nor intelligently given. The court relied on the long period of detention preceding the request for consent to the x-ray, the accusations leveled at the defendants which they were told could be dispelled by the x-ray procedure, and the defendants' lack of familiarity with American judicial procedure. By reaching the consent issue, the district court implicitly held that the defendants' fourth amendment rights were in fact violated when they were detained and subjected to a strip search and x-ray on less than probable cause. The court further held that the customs authorities had violated the defendants' *Miranda* rights. For the following reasons, we reverse.

We begin with the recognition that border searches[4] raise unique constitutional concerns, given the Congress' long recognized power to police entry into this country:

> Import restrictions and searches of persons or packages at the national borders rest on different considerations and different rules of constitutional law from domestic regulations. The Constitution gives Congress broad, comprehensive powers "[t]o regulate Commerce with foreign Nations." Art. I, § 8, cl. 3. Historically such broad powers have been necessary to prevent smuggling and to prevent prohibited articles from entry.

*United States v. Ramsey,* 431 U.S. 606, 619, 97 S.Ct. 1972, 1980, 52 L.Ed.2d 617 (1977), *quoting United States v. 12–200 Ft. Reels of Super 8mm Film,* 413 U.S. 123, 125, 93 S.Ct. 2665, 2667, 37 L.Ed.2d 500 (1973). Pursuant to this grant of power, Congress has enacted 19 U.S.C. § 1582 which provides that "all persons coming into the United States from foreign countries shall be liable to detention and search authorized * * * under [customs] regulations." Customs agents may "stop, search, and examine" any "vehicle, beast or person" suspected of carrying contraband. 19 U.S.C. § 482.

The Supreme Court has also determined that the guarantees of the fourth amendment must be evaluated in conformity with the government's authority to regulate entry:

> Consistently, therefore, with Congress' power to protect the Nation by stopping and examining persons entering this country, the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the interior. Routine searches of the persons and effects of entrants are not subject to any requirement of reasonable suspicion, probable cause, or warrant * * *.

*United States v. Montoya de Hernandez,* —— U.S. ——, 105 S.Ct. 3304, 3309, 87 L.Ed.2d 381 (1985).

Thus, in this case, no question is raised that the customs officials acted within constitutional norms in initially detaining and questioning the two women. We further conclude that the pat-down and search of the women's luggage and purses were within the scope of routine customs practice unrestricted by the fourth amendment. *United States v. Vega-Barvo,* 729 F.2d 1341, 1345 (11th Cir.1984) (luggage search, pat-down justified by person's decision to cross border); *United States v. Sandler,* 644 F.2d 1163, 1169 (5th Cir.1981) (pat-down part of routine search); *United*

---

**3.** The Honorable Clyde S. Cahill, United States District Court for the Eastern District of Missouri.

**4.** Although the defendants entered this country in St. Louis, far removed from a geographical border, such points of entry are considered borders for purposes of the principles set forth here.

*States v. Grayson,* 597 F.2d 1225 (9th Cir.), *cert. denied,* 444 U.S. 873, 100 S.Ct. 153, 62 L.Ed.2d 99 (1979) (no suspicion required for removal of paper from pockets); *United States v. Flores,* 477 F.2d 608, 609 (1st Cir.1973) (baggage, outer clothing may be searched even on a "random basis"); *Henderson v. United States,* 390 F.2d 805, 808 (9th Cir.1967) (contents of wallet, purse, pockets subject to routine search); *but see United States v. Dorsey,* 641 F.2d 1213, 1218–19 (7th Cir.1981) (case-by-case balancing required). At issue for fourth amendment purposes, then, is the validity of the continued detention of the women following the routine inspection, and the strip searches, x-rays, and rectal and pelvic examinations, in light of the fact that the fourth amendment "balance between the interests of the Government and the privacy right of the individual is struck much more favorably to the Government at the border." *Montoya de Hernandez,* 105 S.Ct. at 3310.

We need only briefly discuss the validity of the continued detention of the two women on less than probable cause. The district court did not have the benefit of the Supreme Court's recent decision on this issue in *United States v. Montoya de Hernandez, supra.* *Montoya de Hernandez* holds that "the detention of a traveler at the border, beyond the scope of a routine customs search and inspection, is justified at its inception if customs agents, considering all the facts surrounding the traveler and her trip, reasonably suspect that the traveler is smuggling contraband in her alimentary canal." *Montoya de Hernandez,* 105 S.Ct. at 3311. A reasonable suspicion consists of a "particularized and objec-

tive basis for suspecting the particular person" of smuggling. *Id.* (quoting *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981)). Moreover, the detention may persist until bodily processes dispel the suspicion, at least when the traveler has foregone the opportunity for an x-ray examination. *Id.* 105 S.Ct. at 3312. The Court expressly rejected the ninth circuit's view that there exists a "clear indication" standard, intermediate between "reasonable suspicion" and "probable cause," applicable when a seizure of a traveler persists beyond a routine border search. *Id.* at 3310.

Applying these principles to the facts presented, the *Montoya de Hernandez* Court first concluded that the customs officials reasonably suspected that the defendant was an alimentary canal smuggler at the inception of her detention, based on their trained observations that she fit certain drug courier profile characteristics [5] consistent with that method of transporting drugs. Moreover, when the defendant declined to take an x-ray, and could not be placed on a flight back to Colombia, an incommunicado detention for 16 hours was held not unreasonable in duration, given the nature of the initial suspicion justifying her detention.[6]

In the present case, we hold that the 3½ to 4 hour detention of Oyekan and Keleni was also justified by a reasonable suspicion that the two women were smuggling illegal drugs. The routine inspection and questioning presented the customs officials with strong indicia that the two women were involved in drug trafficking. They were therefore justified in holding the

---

5. The facts recited by the Court reveal that the defendant arrived on a direct flight from Colombia (a drug source country), had taken at least eight trips to either Miami or Los Angeles, gave implausible explanations for her trip, carried a small amount of baggage, spoke no English, knew no one in the United States, possessed a large amount of cash but no checks or credit cards, had no hotel reservations, and could not recall how her airline ticket had been purchased. *See United States v. Montoya de Hernandez,* —— U.S. ——, 105 S.Ct. 3304, 3306–07, 87 L.Ed.2d 381 (1985).

6. After 16 hours of detention, the officials obtained a court order authorizing a rectal examination and an involuntary x-ray, provided the physician in charge considered the defendant's claim that she was pregnant. The rectal exam produced a balloon containing a foreign substance; the defendant was then placed under arrest. She expelled 88 more balloons over the days following, containing a total of 528 grams of 80% pure cocaine hydrochloride. *See Montoya de Hernandez,* 105 S.Ct. at 3308.

women for a strip search, and, when the strip search proved fruitless, until the x-rays were performed. Since *Montoya de Hernandez* makes clear that the officials could have detained the women until the packets were expelled naturally, detentions lasting a shorter time but no longer than necessary to confirm the presence of illegal drugs by x-ray are *a fortiori* reasonable in duration.

■ Having determined that the two women were legally detained, we next turn to the question whether the fourth amendment permitted the strip searches and x-ray examinations conducted before the women were formally arrested. As a threshold issue, we must decide what level of suspicion is required to justify these procedures. The Supreme Court expressly left that question open in *Montoya de Hernandez*, stating that "we suggest no view on what level of suspicion, if any, is required for nonroutine border searches such as strip, body cavity, or involuntary x-ray searches." *Montoya de Hernandez*, 105 S.Ct. at 3311 n. 4.[7] We join those circuits holding that a reasonable suspicion that a person is carrying drugs on the outside of the body may insulate a strip search from fourth amendment challenge.[8] *See United States v. Ogberaha*, 771 F.2d 655, 658 (2d Cir.1985); *United States v. Himmelwright*, 551 F.2d 991, 994–96 (5th Cir.1977); *Hen-*

*derson*, 390 F.2d at 808. We believe that this standard, applied on a case by case basis to particular facts,[9] strikes the proper balance between the high level of the government's interest in securing the nation's borders, *Montoya de Hernandez*, 105 S.Ct. at 3309, and the degree of intrusiveness occasioned by strip searches.

■ Similarly, we concur with the conclusion reached by those circuits holding that a reasonable suspicion that a person is an alimentary canal smuggler may justify an involuntary x-ray examination. *Vega-Barvo*, 729 F.2d at 1344–49; *United States v. Saldarriaga-Marin*, 734 F.2d 1425, 1428 (11th Cir.1984); *United States v. Mejia*, 720 F.2d 1378, 1381–82 (5th Cir. 1983) (applying the "reasonable suspicion" standard); *but see United States v. Quintero-Castro*, 705 F.2d 1099, 1100 (9th Cir.1983) ("clear indication" standard applicable). Although the question is not free from doubt, *see Vega-Barvo*, 729 F.2d at 1351–52 (Hatchett, J., dissenting); *Quintero-Castro*, 705 F.2d at 1100–01, we find the *Vega-Barvo* court's analysis of this issue persuasive and adopt its reasoning.[10] Thus, with respect to either a strip search or an x-ray, the crucial question is whether the government has shown "articulable facts which are particularized as to the

**7.** Although the majority refrained from deciding the issue, Justice Stevens was of the view that "Customs agents may require that a non-pregnant person reasonably suspected of * * * [alimentary canal] smuggling submit to an x-ray examination as an incident to a border search." *Montoya de Hernandez*, 105 S.Ct. at 3313 (Stevens, J., concurring in the judgment). Under Justice Stevens' view, the officials in this case would have been justified in having the x-rays administered.

The Court also declined to decide whether, at a border, an alien possesses lesser fourth amendment rights then a citizen. *Montoya de Hernandez*, 105 S.Ct. at 3311 n. 4.

**8.** This standard is sometimes described as a "real suspicion"; the two articulations describe substantially the same standard. *See United States v. Guadalupe-Garza*, 421 F.2d 876, 879 (9th Cir.1970).

**9.** The second circuit in *United States v. Asbury*, 586 F.2d 973, 976–77 (2d Cir.1978) set forth,

based on the court's review of the decided cases, twelve factors which may be taken into account in determining the issue of reasonableness. Although these factors are not exhaustive, they provide useful guideposts in analyzing the myriad factual variations customs officials may encounter.

**10.** We are not unmindful that exposure to x-rays may pose significant health problems, especially for pregnant women. *See Montoya de Hernandez*, 105 U.S. at 3321–22 (Brennan, J., dissenting). Our holding is predicated on the assumption that the x-ray is administered in a hospital by trained medical personnel, and that an appropriate medical history is taken from the patient. We express no view of the validity of an x-ray procedure when these conditions are not met, or when physical force is used in effecting the procedure. *Cf. Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

person and as to the place to be searched." *Vega-Barvo*, 729 F.2d at 1349.

Applying this standard to the case before us, we conclude that the strip searches were justified by a reasonable suspicion that the two women were trafficking in drugs. At the time these searches were conducted, customs officials had sufficient information to reasonably conclude that these women were smuggling drugs, possibly on the surface of their bodies or within a body cavity.[11] In these circumstances, a strip search is within the scope of that reasonable suspicion. *See United States v. Asbury*, 586 F.2d 973, 977 (2d Cir.1978) (drug courier profile characteristics justify strip search at border); *see also United States v. Gutierrez*, 667 F.2d 16, 19 (5th Cir.1982) (profile characteristics in conjunction with two other factors sufficient); *United States v. Himmelwright*, 551 F.2d 991, 995–96 (5th Cir.1977) (profile characteristics and evasive answers sufficient). Once the officials discovered that the women were not carrying drugs externally, their suspicions were reasonably aroused that the women instead were carrying them within their bodies, justifying the x-ray procedure. *See Vega-Barvo*, 729 F.2d at 1350 (facts similar to present case justified x-ray); *United States v. Pino*, 729 F.2d 1357, 1359 (11th Cir.1984) (same).

Moreover, we find that these procedures were performed in this case by the least intrusive means possible. There is no evidence that the women were touched or prodded by the inspectors in the course of the strip search or the x-ray, or that physical force was ever used against them. These are important considerations in weighing "the level of insult to personal privacy visited upon the victim of a search." *Vega-Barvo*, 729 F.2d at 1346; *see also Saldarriaga-Marin*, 734 F.2d at 1428. Moreover, these procedures are arguably far less intrusive than the procedure approved in *Montoya de Hernandez:* evacuating the bowels in a trash can in front of an official monitor.

Even assuming that the customs officials lacked a reasonable suspicion to justify the x-ray examination, we hold in the alternative that the district court erred in finding that the women did not voluntarily consent to the x-ray. Whether consent was given is a determination to be made from the totality of the circumstances. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); *United States v. Weir*, 748 F.2d 459, 460 (8th Cir.1984). In this case, both Oyeken and Keleni were told that they had a right to refuse the x-ray, a consideration deemed highly relevant to the issue of voluntariness. *United States v. Mendenhall*, 446 U.S. 544, 558–59, 100 S.Ct. 1870, 1879, 64 L.Ed.2d 497 (1980). They both signed consent forms and authorized the release of the results of the x-rays to customs officials. *Cf. United States v. Gomez-Diaz*, 712 F.2d 949, 951 (5th Cir.1983) (consent voluntary even though the defendant declined to sign consent forms). Moreover, they both gave oral consent and cooperated fully with hospital personnel, and, as the district court explicitly found, the women were able to speak and understand English to the extent necessary to comply with the Customs Service's requests. It is also undisputed that Oyeken and Keleni understood what the x-ray procedure entailed. Keleni even requested to see the x-rays herself, explaining that she knew how to read them properly. *See United States v. D'Allerman*, 712 F.2d 100, 104 (5th Cir.), *cert. denied*, 464 U.S. 899, 104 S.Ct. 254, 78 L.Ed.2d 240 (1983) ("voluntary consent requires an intellectual understanding of exactly what is being requested and a voluntary acquiescence in light of that understanding").

---

11. To repeat, those circumstances included the small amount of luggage carried by the two women, the short length of their stay, their point of origin, their implausible explanations of the purpose of their trip, that they carried only cash, that they claimed to be travelling separately but had consecutively numbered tickets and planned to stay at the same hotel, the name of which was identically misspelled on their travel documents, that they paid for their tickets in cash, and had no friends or relatives in the United States.

Given these circumstances, we are compelled to find the district court's finding to be clearly erroneous. The district court relied on the women's lack of familiarity with American legal procedure, that they had been accused of lying, and their lengthy detention in reaching the conclusion that they gave consent involuntarily. We find that the defendants' lack of understanding of the full legal consequences of their decision is not in itself sufficient to vitiate their consent. Their comprehension of the act requested, not its legal significance, is the more compelling factor. *See D'Allerman,* 712 F.2d at 104; *United States v. Mejia,* 720 F.2d 1378, 1381 (5th Cir.1983); *see also Oregon v. Elstad,* —— U.S. ——, 105 S.Ct. 1285, 1297–98, 84 L.Ed.2d 222 (1985) (appreciation of all consequences of waiving right to remain silent not a *sine qua non* for effective waiver). Nor can the accusations of lying undermine the effectiveness of the consent. To hold that the mere utterance of such a charge can overbear the express consent of a suspect would only encourage less candid, and perhaps more subtle and coercive, tactics by the police. Finally, we cannot agree that the length of the women's detention alone or in combination with all the circumstances supports the district court's conclusion. The two women, although detained for several hours, were not in custody in the sense that they were under formal arrest.[12] The officials made no show of force, nor did they place the women under physical restraint or otherwise exceed the bounds of means necessary to continue the detention. We therefore hold that the district court clearly erred in concluding that the women's consent to the x-ray was coerced.

Lastly, we consider whether the rectal probe and pelvic examinations administered to Oyekan and Keleni after they were arrested was a legal search incident to an arrest. Whether a body cavity search conducted following a warrantless arrest is reasonable requires consideration of the factors set forth in *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966),[13] recently affirmed in *Winston v. Lee,* —— U.S. ——, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985):

> *Schmerber* recognized that the ordinary requirements of the Fourth Amendment would be the threshold requirements for conducting this kind of surgical search and seizure.
>
> * * * Beyond these standards, *Schmerber's* inquiry considered a number of other factors in determining the "reasonableness" of the blood test. A crucial factor * * * is the extent to which the procedure may threaten the safety or health of the individual. * * * Moreover, all reasonable medical precautions were taken and no unusual or untested procedures were employed * * *.
>
> Another factor is the extent of intrusion upon the individual's dignitary interests in personal privacy and bodily integrity. * * *
>
> Weighed against these individual interests is the community's interest in fairly and accurately determining guilt or innocence.

*Winston,* 105 S.Ct. at 1617–18. We believe that a weighing of these factors indicates that the rectal and pelvic examinations did not violate the fourth amendment. A medi-

---

**12.** Nor were they "in custody" for *Miranda* purposes, such that they were untimely warned of their fifth amendment rights. We agree with the ninth circuit that "the warnings required by *Miranda* need not be given to one detained at the border 'unless and until the questioning agents have probable cause to believe that the person questioned has committed an offense, or the person questioned has been arrested." *United States v. Espericueta-Reyes,* 631 F.2d 616, 622 (9th Cir.1980), *quoting Chavez-Martinez v. United States,* 407 F.2d 535, 539 (9th Cir.1969). Further, "detentions during legitimate * * * border

searches do not constitute arrests * * *." *Id. See also United States v. Moore,* 638 F.2d 1171, 1175 (9th Cir.1980); *United States v. Golden,* 532 F.2d 1244, 1246 (9th Cir.1976).

**13.** We believe a body cavity search must be conducted consistently with the *Schmerber* factors, even though such a search does not technically require piercing the skin, because both the degree and kind of intrusion involved are of analogous proportions.

cal professional at the hospital in fact informed the two women that they were subjecting themselves to a grave risk by carrying the drugs inside them.[14] Thus, had the procedure not been performed, the health of the women would have remained in jeopardy until all of the packets were expelled. We view these considerations as more substantial than dignitary injury occasioned by the concededly embarrassing procedure. Also weighing in the balance is the fact that the procedure was performed in a hospital by a physician and did not itself pose health risks to the defendants. Since we hold that the detentions and searches of the defendants did not violate the fourth amendment, the judgment of the district court is reversed.

---

**14.** Our review of the cases dealing with alimentary canal smuggling suggests that very poor and vulnerable people are used to transport drugs in this fashion. *See e.g., United States v. DeMontoya,* 729 F.2d 1369, 1370 (11th Cir.1984); *United States v. Contento-Pachon,* 723 F.2d 691 (9th Cir.1984). We are informed that both defendants in this matter have been detained in jail pending this appeal. On remand, we request that an immediate trial be held and further recommend that, if the defendants are convicted, any jail time already served should be credited to any sentence they might otherwise receive. We also note that both women have received punishment of over sixteen months in jail, that both are aliens and that their alleged offense of serving as drug couriers was undoubtedly instigated by others in Nigeria and in the United States. Under these circumstances, a recommendation of deportation should be considered in lieu of any further confinement.