UNITED STATES of America, Appellee,

v.

Michael Patrick QUIGLEY, Appellant.

No. 88–5528.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 13, 1989.

Decided Nov. 28, 1989.

---

Douglas Altman, Minneapolis, Minn., for appellant.

John M. Lee, Minneapolis, Minn., for appellee.

Before ARNOLD, Circuit Judge, HENLEY, Senior Circuit Judge, and BEAM, Circuit Judge.

BEAM, Circuit Judge.

Micheal Quigley appeals his conviction of possession with intent to distribute cocaine in violation of 21 U.S.C. § 841(a)(1) (1982). We affirm.

## I. Background

Quigley was stopped for speeding by Trooper William Ulvi of the Minnesota State Patrol at 7:55 a.m. on April 29, 1988. Quigley was travelling north on Interstate 35 in a rented Cadillac Seville. He was clocked at a speed of 71 m.p.h. in a 55 m.p.h. zone; and, Quigley was not wearing corrective lenses as his license required. While Ulvi was writing a ticket for these offenses, he was informed by dispatch of an outstanding warrant for Quigley's arrest. Ulvi arrested Quigley, placed him in the squad car, and returned to the Cadillac to inventory its contents in preparation for a custody tow. He first noted a black nylon bag on the floor of the front seat, but his attention was quickly drawn to a black plastic case on the back seat. Ulvi recognized it as a case containing a ten gram, portable scale, often used to measure cocaine. Ulvi then seized the top of a shoe box from the floor of the back seat. In the shoe box top was a glass pipe commonly used for smoking marijuana and a bulging manila envelope which contained one kilogram of cocaine. In addition, the inventory yielded two airline tickets with boarding passes. One ticket, in the name of Quigley, was for passage from Minneapolis to Los Angeles, departing Minneapolis at 9:40 p.m. on April 28. The other, in the name of Mihalow, provided for departure from Los Angeles at 1:30 a.m., returning to Minneapolis before 7:00 a.m. on April 29. Finally, Ulvi found a rental agreement for the Cadillac, signed by Kathy Mihalow, Quigley's girlfriend. Quigley had on his person $1740, a date book with various entries for airlines, car-rental agencies and hotels, a frequent flier card, a telephone credit card in the name of Mihalow, and a business card with various, handwritten figures on the backside, allegedly recording drug transactions.

At trial, the government introduced much of this evidence through Officer Ulvi, its first witness. The government called, as its second witness, Steven Moss, a police officer of the Metropolitan Airport Commission. Moss had no personal connection to the case, other than being called in his capacity as an investigator in the Airport Narcotics Detail. Officer Moss testified that his work at the airport entailed watching for and investigating persons suspected of being drug couriers. In addition, Moss testified to the specific characteristics used by airport security officers to spot possible couriers. These identifying characteristics included purchasing a ticket shortly before

departure, paying for it with cash, checking no luggage, travelling under an assumed name, and generally acting in a nervous manner at the airport. At the direction of the prosecutor, Moss then examined Quigley's airline tickets, noting the arrival and departure times. He also noted that they were purchased with cash shortly before departure, and that the time between the two flights in Los Angeles was less than three hours. In a similar manner, the prosecutor led Moss through many characteristics of the drug courier profile, making specific references en route to the evidence against Quigley.

Following Moss, the prosecution called an employee of Northwest Airlines to put into evidence a report of Quigley's frequent flier card usage, which indicated that, although Quigley was unemployed, he had made eight trips between Los Angeles and Minneapolis since January 29, 1988. The prosecution also called an officer of the Minneapolis Police Department to testify that the notations on the business card were likely a record of drug transactions made on credit, in terms of quantity and purchase price.

Quigley did not testify, but the defense did call an employee of the Bureau of Criminal Apprehension who worked in the forensics laboratory. He testified that Quigley's fingerprints were not found on either the scale or the envelope containing the cocaine. This, essentially, was Quigley's defense: that the cocaine belonged to someone else, that not even the car was his, and that he had no knowledge that the cocaine was in the car. The jury returned a verdict of guilty.

On appeal, Quigley argues, mainly, that the testimony of Officer Steven Moss about the drug courier profile was inherently prejudicial and denied him a fair trial.

II. Discussion

■ We have characterized the drug courier profile as an "informal compilation of characteristics often displayed by those trafficking in drugs," *United States v. Campbell*, 843 F.2d 1089, 1091 n. 3 (8th Cir.1988), and as an " 'abstract of charac-

teristics found to be typical of persons transporting illegal drugs.'" *United States v. Oyekan*, 786 F.2d 832, 834 n. 2 (8th Cir.1986) (citing *Florida v. Royer*, 460 U.S. 491, 493 n. 2, 103 S.Ct. 1319, 1322 n. 2, 75 L.Ed.2d 229 (1983)). Similarly, Chief Justice Rehnquist has described the profile as essentially an investigative tool involving characteristics recognizable to trained officers. "A 'profile' is, in effect, the collective or distilled experience of narcotics officers concerning characteristics repeatedly seen in drug smugglers." *Florida v. Royer*, 460 U.S. 491, 525 n. 6, 103 S.Ct. 1319, 1339 n. 6, 75 L.Ed.2d 229 (1983) (Rehnquist, J., dissenting). Proper emphasis, then, is placed not on the profile *per se*, but on characteristics common to couriers.

This emphasis suggests the usual context in which the courts have considered the evidence. It is most often discussed in fourth amendment search and seizure cases. In this context, use of profile characteristics by field officers to make investigative stops has been upheld by the courts as proper; that is, profile characteristics can provide reasonable cause to make a stop. While the Supreme Court was initially hesitant to approve a stop on the basis of profile characteristics, *see Reid v. Georgia*, 448 U.S. 438, 100 S.Ct. 2752, 65 L.Ed.2d 890 (1980) (characteristics included arrival from source city, arrival in the early morning, efforts by defendant to disassociate himself from his travelling companion, and no luggage other than a shoulder bag), the Court has more recently upheld careful, appropriate use of the profile as the basis for investigative detention. *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). Significantly, the Court noted that it is the characteristics themselves which are important, not their compilation into, and labelling as, a profile. "[T]hat these factors may be set forth in a 'profile' does not somehow detract from their evidentiary significance." *Id.* 109 S.Ct. at 1587.

This circuit has also approved the use of profile characteristics as the basis for reasonable suspicion. Most recently, in *United States v. Nunley*, 873 F.2d 182 (8th

Cir.1989), we upheld an investigative stop as based on reasonable suspicion derived from seeing numerous characteristics which were consistent with the profile. The significant characteristics justifying the stop were purchasing, shortly before departure, a one way ticket with cash, checking no luggage, and acting nervously at the airport. *Nunley,* 873 F.2d at 183–84. Specifically, we noted that it is the particular factual observations of the officers in any given case which create reasonable suspicion. It is the characteristics, and not their mechanical application as a drug courier profile, which are legally significant. *Id.* at 185. Thus, we have upheld stops based on profile characteristics in many fourth amendment cases. *See, e.g., United States v. Hernandez,* 854 F.2d 295 (8th Cir.1988); *Campbell,* 843 F.2d 1089; *United States v. Reiner–Ramos,* 818 F.2d 1392 (8th Cir.1987); *United States v. Poitier,* 818 F.2d 679 (8th Cir.1987) *cert. denied,* 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988); *Oyekan,* 786 F.2d 832; 786 F.2d 832; *United States v. Jones,* 759 F.2d 633 (8th Cir.), *cert. denied, Jones v. United States,* 474 U.S. 837, 106 S.Ct. 113, 88 L.Ed.2d 92 (1985); *United States v. Hendrix,* 726 F.2d 433 (8th Cir.1984); *United States v. Wallraff,* 705 F.2d 980 (8th Cir. 1983); *United States v. Swayne,* 700 F.2d 467 (8th Cir.1983).

This case, however, does not involve an investigative stop and the issue of reasonable suspicion based on profile characteristics. Rather, the drug courier profile was presented at trial through the testimony of Officer Moss, in the guise of an expert, as a technique for identifying a drug offender. This use of the profile is, of course, dramatically different than its use at an airport to make an investigative stop. As a result, we cannot merely approve the use of the profile based on our prior cases, because here, as indicated, the profile was used as substantive evidence of guilt.

Two other circuits have considered use of the profile as substantive evidence, and both have disapproved. In *United States v. Hernandez–Cuartas,* 717 F.2d 552 (11th Cir.1983), defendant was stopped at United States Customs in Miami after arriving from Columbia. Defendant's passport indicated three prior trips in three months, and prompted a careful inspection of her bag of coffee cans, many of which were found to contain cocaine. *Id.* at 553–54. At trial, the government introduced testimony from a customs inspector about the use and meaning of the profile. *Id.* at 554. Defendant argued on appeal that the testimony was prejudicial and denied her a fair trial. *Id.*

In considering the prejudicial effect of the testimony, the Eleventh Circuit noted that even the use of the profile to establish reasonable suspicion should be viewed critically, since the profile is nothing more than an investigative technique of law enforcement officers. *Id.* at 555. That concern, while not prohibiting the use of the profile, led the court to warn against its use as substantive evidence. "Although this information is valuable in helping drug agents to identify potential drug couriers, we denounce the use of this type of evidence as substantive evidence of a defendant's innocence or guilt." *Id.* The Eleventh Circuit affirmed the conviction, however, because the testimony admitted "was used purely for background material on how and why Ms. Hernandez–Cuartas was stopped and searched by the custom officers." *Id.*

In *United States v. Beltran–Rios,* 878 F.2d 1208 (9th Cir.1989), the Ninth Circuit relied on *Hernandez–Cuartas,* noting that "[t]he use of criminal profiles as evidence of guilt in criminal trials has been severely criticized." *Beltran–Rios,* 878 F.2d at 1210. Defendant had objected to the testimony of a drug enforcement agent that a typical drug courier exhibited certain characteristics, and that defendant was within the description. The court noted, however, that the testimony came in response to cross-examination, by defense counsel, which attempted to establish that defendant was not a typical drug courier because he "lack[ed] the accoutrements of wealth associated with such a profitable activity." *Id.* at 1212. The Ninth Circuit thus approved the testimony as rebuttal testimony, but emphasized "that the holding in this

case is a relatively narrow one. The Government may introduce profile testimony of this sort only to rebut specific attempts by the defense to suggest innocence based on the particular characteristics described in the profile." *Id.* at 1213 n. 2.

This case does not involve use of the testimony within the limits of either *Hernandez–Cuartas* or *Beltran–Rios*. Rather, the prosecution here presented the profile as evidence of guilt, in exactly the manner which the Ninth and Eleventh Circuits criticize.[1] The testimony of Officer Moss was not presented as background evidence on why Quigley was stopped. Indeed, he was not stopped at the airport, and the involvement of Moss in the case was limited to his testimony at Quigley's trial. Nor was the testimony used to rebut any attempts by Quigley to suggest that he did not have the characteristics of a drug courier. Rather, the prosecution intended the testimony to establish evidence of Quigley's intent to distribute cocaine, beyond the evidence of mere possession.

While Moss initially testified to the general and acceptable use of profile characteristics, his testimony soon became specific to Quigley and the evidence against him. Moss started by describing his work as looking for people who fit a "narcotic trafficker profile," Trial Transcript, vol. 2, at 95. He delineated these factors: purchasing tickets shortly before departure, paying for them with cash, checking no baggage, providing no local address, and exhibiting nervousness at the airport. *Id.* at 97. But the prosecutor then led Moss through the evidence against Quigley, piece by piece. Moss referred to Quigley's airline tickets, which were in evidence, identified the flight times and destinations, noted that both

tickets were nonstop, that they were purchased with cash, that the return flight arrived in the early morning, and that Quigley would have been in Los Angeles for less than three hours between flights. *Id.* at 103–05. Moss then considered the boarding pass in Quigley's name, and noted that the seat, 27F, was in the back of the plane, *Id.* at 107, a factor Moss had already described as characteristic of drug couriers. *Id.* at 106. Moss noted that the flight arrived in Minneapolis in the early morning, and when asked the significance of that factor, noted that "[w]e have found, and by interviewing people that we have arrested, that they use this flight as an attempt to defeat our surveillance programs." *Id.* at 107. The prosecutor then handed Quigley's address book to Moss and asked him whether he found anything significant in it. *Id.* at 108. He noted the phone numbers for airlines, hotels, rental car agencies, and Western Union. *Id.* at 108–09. The numbers for the airlines were important because "that is how they bring drugs to Minnesota." *Id.* at 109. The numbers for rental car agencies were important because "people that we have arrested have been in rental cars rented at the airport." *Id.* And the number for Western Union was important because "people a lot of times do not carry the money with them when they go to a source city." *Id.* at 110.

This point by point examination of profile characteristics with specific reference to Quigley constitutes use of the profile not as background to explain or justify an investigative stop, but as substantive evidence that Quigley fits the profile and, therefore, must have intended to distribute

---

1. The Eleventh Circuit in *Hernandez–Cuartas* itself confirms that this testimony is nothing like that which the Eleventh Circuit approved as background. Indeed, this sort of questioning was apparently attempted at trial, but, after objection, was not continued.

After a series of questions had been put to Customs Agent Weitjdemuller touching upon his training and experience and his answers had included reference to his training in what he described as drug courier and hijacker profiles, *government counsel put a question seeking a response as to whether or not appel-*

*lant fit any particular profile.* At that point, appellant objected. While the trial judge indicated that the prosecutor might pursue the line of inquiry, the form of the question was criticized. Thereafter, a different question was put, *properly* inquiring as to those things which influenced the agent to assign appellant for a secondary inspection, and neither questions nor answers along this line touched upon the existence *vel non* of a "profile." *Hernandez–Cuartas*, 717 F.2d at 554 n. 1 (emphasis added).

the cocaine in his possession. While Moss did not directly say that he thought Quigley was guilty of the offense charged because he fit the profile, that was the clear implication of his testimony. This use of drug courier profile evidence was error.

■ As in many of these matters, however, the outcome of this appeal does not turn upon the receipt of some improper evidence. Indeed, Quigley's conviction is supported by such substantial evidence that it is somewhat difficult to understand why the profile evidence was proffered. Quigley had in his possession, in plain view, within an arm's reach in the car, one kilogram (2.2 lbs.) of high-quality cocaine. This, together with the notes on his person indicating earlier drug transactions, the frequent trips to Los Angeles with tickets paid for in cash even though he was unemployed and the large amount of money in his possession when arrested provided ample evidence for Quigley's conviction and also provides a substantial basis for us to affirm the conviction. *See United States v. Johnson,* 879 F.2d 331, 334–35 (8th Cir. 1989).

III. Conclusion

While we disapprove of the use of the profile evidence in this particular case, we cannot say, given the facts adduced at trial, that its effect was so prejudicial that it deprived Quigley of a fair trial. Thus, the error, in the context of all the evidence, was harmless. Therefore, the judgment of the district court is affirmed.