Roy Dale RYAN, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 98–279.

Supreme Court of Wyoming.

Oct. 8, 1999.

Representing Appellant: Sylvia Lee Hackl, State Public Defender; Donna D. Domonkos, Assistant Public Defender; and Mi-

chael Dinnerstein, Assistant Public Defender. Argument by Mr. Dinnerstein.

Representing Appellee: Gay Woodhouse, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Karen A. Byrne, Special Assistant Attorney General. Argument by Ms. Byrne.

Before LEHMAN, C.J., and THOMAS, MACY, and GOLDEN, JJ.; and KALOKATHIS, D.J.

KALOKATHIS, District Judge.

Convicted of murdering his wife, Appellant alleges numerous errors deprived him of his right to a fair trial. While we find that Appellant was impermissibly profiled by expert testimony, the error was harmless beyond a reasonable doubt. As none of Appellant's other contentions are meritorious, we affirm.

## I. ISSUES

Appellant, Roy Dale Ryan (Ryan), presents eight issues for our review:

I. Did the trial court deprive Appellant of his constitutional right to a fair trial when it told the prospective jurors that appellant was there because he murdered his wife?

II. Did the trial court deprive Appellant of his constitutional right to a fair trial by refusing to grant a mistrial after a juror shared with her fellow jurors the fact that she had been threatened and her car damaged?

III. Did the trial court deprive Appellant of his constitutional right to a fair trial when it permitted a witness who was only five years old at the time of the incident to testify even though she did not have the mental capacity at the time of the occurrence to receive an accurate impression of it and did not have memory sufficient to retain independent recollection of the occurrence?

IV. Did the trial court deprive Appellant of his constitutional right to a fair trial when it refused to bar testimony suggesting that batterers have a propensity to kill those whom they have abused?

V. Did the trial court deprive Appellant of his due process right to a fair trial by refusing to bar evidence that the prosecution had obtained with a warrant from a court that did not have jurisdiction over Appellant's case and in a manner in which the defense had been denied the opportunity to be heard?

VI. Did the court deprive Appellant of his constitutional right to confront the witnesses against him by permitting a witness to testify remotely under circumstances in which the jury, the court, counsel, and appellant could not observe the witness' demeanor and the witness could not see the accused?

VII. Was Appellant deprived of his due process right to a fair trial when a security officer demanded to know whether the jury was close to a verdict?

VIII. Is the sentence that the court imposed upon Appellant for second degree murder illegal because it is definite rather than indeterminate?

Appellee, State of Wyoming (the State), more succinctly rephrases the issues as:

I. Did a single comment by the trial court create reversible error?

II. Was there jury tampering, and if so, did it constitute reversible error?

III. Was the child witness who was present at the scene of the murder competent to testify?

IV. Did the testimony of an expert witness create plain error?

V. Did the trial court properly admit evidence obtained from a legally sufficient search warrant?

VI. Was Appellant allowed to confront witnesses against him?

VII. Was Appellant deprived of a fair trial when a security officer made a casual comment to a juror during a smoke break?

VIII. Was Appellant's life sentence illegal because it was a definite rather than indeterminate sentence?

## II. FACTS

On December 11, 1996, the Green River Police Department received a call from a man asking for assistance and an ambulance. The caller stayed on the line only for a matter of seconds, but the dispatcher was able to trace the call to an address in the Shelter Valley Trailer Court. Green River Police Officers Cezanne Brennan and Stan Brannum were the first to arrive at the scene.

The officers approached the trailer and knocked on the outside of the residence. The front door was slightly ajar, and after the officers knocked, a small black dog pushed the door open far enough that the officers could see into the trailer. They saw a man, later identified as Ryan, lying in a pool of blood in the kitchen. They entered the residence, approached Ryan, and ascertained that he had been shot in the chest. Officer Brennan asked Ryan, "Who shot you?" and Ryan responded, "I did."

Officer Brannum then conducted a protective sweep of the trailer. He found a young boy and a five-year-old girl apparently asleep in one bedroom. Officer Brannum then proceeded into the back bedroom and found an infant in a crib and Keri Ryan (Keri), Ryan's wife, lying on the bed in a pool of blood with a .22 magnum two-shot Derringer under her hand. Brannum determined that Keri was dead. He returned to the kitchen and handcuffed Ryan.

Within seconds of the officers' arrival at the scene, EMT's arrived and began treating Ryan's wound. Ryan attempted to thwart their efforts and stated that he did not want to be treated. As he lost more blood, however, his efforts became less effective. Ryan was transported to the hospital, and Officer Brennan accompanied him to collect his clothing and other possible evidence.

As Ryan's treatment continued, he again became combative and asked not to be treated. In the emergency room an unidentified individual asked Ryan, "What happened?" and Ryan responded, "It was an accident." Officer Brennan then asked Ryan, "Who had the gun," and he responded, "We both did." Ryan was taken to LDS Hospital in Salt Lake City, Utah, where he subsequently fell into a coma for several weeks. When he awoke, he claimed to have no memory of the incident, although he did present a nurse with a note which read, "How did I miss," next to a picture of a heart.

Further investigation revealed that Keri had been shot once in the neck. The bullet lodged in her spinal cord, causing instantaneous paralysis and death. The blood patterns in the back bedroom led investigators to conclude that Keri's body had been moved after she had been shot, and the gun had been placed under her hand by someone else. Moreover, judging from the position of Keri's body at the time she was shot, it was likely that she was lying down or only partially sitting up on the bed at the time she was shot. The evidence indicated that Keri was not involved in a struggle prior to her death, and the location of the wound indicated that she had not committed suicide.

The Derringer found under Keri's hand contained two spent Federal brand cartridges. Ryan's mother admitted that the gun belonged to her and produced a partially empty box of Federal brand cartridges from her home. The gun was ordinarily kept in a gun cabinet, which was broken and did not lock, in Ryan's parents' home. Both Ryan and Keri had equal access to the gun, as both visited Ryan's parents' home frequently. Investigators found that Ryan and Keri each had gunshot residue on their hands on the night of the shootings.

Ryan and Keri had a turbulent marriage punctuated by Ryan's physical abuse of his wife, which he admitted at trial. An exhaustive list of friends, neighbors, and coworkers testified to Ryan's physical, mental, and emotional abuse of Keri throughout the course of their marriage. The State produced witnesses who testified to several incidents where Ryan punched and kicked Keri in fits of rage. Additionally, the State produced witnesses who stated that Ryan controlled and isolated Keri. Ryan would not allow Keri to go anywhere without his permission, and

he demanded to know where she was and who she was with at all times. According to Keri's coworkers, Ryan called her at work ten times or more during her shifts to check up on her. There was testimony that Ryan had attempted to commit suicide in Keri's presence on one occasion. There was testimony that Ryan emotionally abused Keri through constant criticism. There was extensive testimony about Ryan's excessive jealousy. He often accused Keri of having extramarital affairs with the customers she spoke with at work, and on more than one occasion he assaulted men who spoke with Keri.

Keri left Ryan in early November of 1996 and had a family violence protection order issued against Ryan on November 5, 1996. That order was subsequently dismissed at Keri's request. During the separation period, Keri expressed her desire to return to school; she began dating another man and suggested that Ryan begin dating other women. For his part, Ryan did not handle the separation well. He became depressed and had noticeable weight loss.

Ryan was charged with first degree murder in violation of Wyo. Stat. Ann. § 6–2–101(a).[1] After lengthy deliberations, the jury convicted Ryan of the lesser included offense of murder in the second degree, in violation of Wyo. Stat. Ann. § 6–2–104.[2] Ryan received a life sentence, and this timely appeal followed.

## III. DISCUSSION

### A. EVIDENTIARY CLAIMS OF ERROR

The decisions of the district court concerning the admission of witness testimony and the admission of evidence procured from a second search of the trailer are reviewed under the same standard of review. We recently summarized the considerations relevant to review of evidentiary rulings in *Solis v. State*, 981 P.2d 34 (Wyo.1999):

Evidentiary rulings are within the sound discretion of the trial court and include determinations of the adequacy of foundation and relevancy, competency, materiality, and remoteness of evidence. *Punches v. State*, 944 P.2d 1131, 1136–37 (Wyo. 1997). This court will generally accede to the trial court's determination of the admissibility of evidence unless that court clearly abused its discretion. *Brown v. State*, 944 P.2d 1168, 1170 (Wyo.1997); *Wilson v. State*, 874 P.2d 215, 218 (Wyo. 1994). In determining whether the trial court abused its discretion, the query is whether the court could reasonably conclude as it did, and whether its ruling was arbitrary or capricious. *Vaughn v. State*, 962 P.2d 149, 151–52 (Wyo.1998). The burden of establishing such abuse lies with the defendant. *Barnes v. State*, 858 P.2d 522, 527 (Wyo.1993).

If the trial court erred by admitting evidence, we then must ascertain whether the error affects any substantial rights of the accused, providing grounds for reversal, or whether it is harmless. The harmless error standard is set out in W.R.A.P. 9.04:

Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded by the reviewing court.

*See also* W.R.Cr.P. 52. An error is harmful if there is a reasonable possibility that the verdict might have been more favorable to the defendant if the error had never occurred. *Kolb v. State*, 930 P.2d 1238, 1247 (Wyo.1996); *Kerns v. State*, 920 P.2d 632, 641 (Wyo.1996). To demonstrate harmful error, the defendant must show prejudice under "circumstances which manifest inherent unfairness and injustice,

---

1. Wyo. Stat. Ann. § 6–2–101(a) (LEXIS 1999) provides:

 (a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, kills any human being is guilty of murder in the first degree.

2. Wyo. Stat. Ann. § 6–2–104 (LEXIS 1999) provides:

 Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree, and shall be imprisoned in the penitentiary for any term not less than twenty (20) years, or during life.

or conduct which offends the public sense of fair play." *Johnson v. State*, 790 P.2d 231, 232 (Wyo.1990); *see also Roderick v. State*, 858 P.2d 538, 550 (Wyo.1993).

*Id.* at 36.

### 1. SEPARATION VIOLENCE—THE BRATTON TESTIMONY

Rosemary Bratton has extensive experience working with both battered and battering spouses and has previously testified as an expert on the subject of Battered Woman Syndrome (BWS). BWS experts generally attempt to explain the irrational behavior of battered spouses, such as seeking withdrawal of a protective order or continually returning to an abusive spouse. Here, however, the State made known to defense counsel that Bratton would also testify about the characteristics of batterers and the kind of conduct they tend to exhibit. Ryan objected to that portion of the Bratton testimony pertaining to anything he might have done. While the trial judge admitted that he was having trouble determining the relevancy of Bratton's testimony concerning Ryan's actual or possible actions; ultimately, she was allowed to testify.

At trial, Bratton began by explaining the now familiar characteristics of BWS to the jury. She explained the cyclical pattern of violence often present in abusive relationships and then went on to describe a phenomena termed, "separation violence":

Q. Now, is there any particular phase of this cycle of violence which tends to be more dangerous than another?

A. Yes. And we actually term it now as separation violence. What I know from my experience and what we know from the literature and the research that has been done is that the time that the victim is planning to leave or has left this relationship is the time of the greatest danger. That's the time more homicides are committed, that's the time when there's greater physical injury, and it happens because perpetrators of domestic violence who need to maintain power and control over their partner become extremely upset, nervous,

agitated when they feel that they are losing that control. When they feel that that person is actually going to leave them, then it becomes far more dangerous for the victim, because the violence will escalate to whatever it takes to prevent this person from actually leaving. They are losing control, they are losing access to this individual, and it's a very very dangerous time for victims.

Q. Now, this separation violence is what you've termed this; is that correct?

A. That's correct.

Q. And have there been any studies done here in Wyoming on that issue?

A. Yes, there have. There's a study that our coalition sponsored. We started this study in the early '90s, and we went back to 1985 and looked at those incidents of domestic homicides in our state, and one of the interesting facts that we learned was that of the—of the 38 individuals that—that are a part of our research, 16 of those had actually left the relationship.

Bratton added that the majority of the women involved in the study were killed with guns. She then described those characteristics exhibited by batterers. She testified that batterers tend to control and isolate their spouses by such means as constant calls to their place of employment, demanding to know where they are, who they are with, and when they will return. Bratton stated that batterers will often threaten to commit suicide in order to force their partner to remain in the relationship. She testified that batterers tend to abuse their spouses emotionally through constant criticism. She also testified that batterers tend to exhibit pathological jealousy often accusing their spouses of having adulterous affairs with random strangers.

The prosecutor argued, and the district court agreed, that separation violence is a logical extension of BWS. Ryan argued that under W.R.E. 404(a), such an extension is not admissible. W.R.E. 404(a) prohibits use of evidence of a person's character if used to prove that he acted in conformity therewith. If offered pursuant to W.R.E. 404(b)[3], evi-

---

**3.** W.R.E. 404(b) provides:

(b) *Other crimes, wrongs, or acts.*—Evidence

dence which implies bad character is admissible for a limited purpose, but not to show conduct conforming to character. A large part of the testimony which portrayed Ryan as an angry and violent person who expressed that violence toward his wife was admitted for W.R.E. 404(b) reasons. That testimony was not offered for the purpose of showing that he acted in conformity therewith, but rather to show motive, intent, or identity. The expert testimony on separation violence, however, was not offered under W.R.E. 404(b), and, therefore, we must determine if it violates W.R.E. 404(a).

W.R.E. 404(a), provides in pertinent part:

(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion[.]

Mueller and Kirkpatrick explain the rule's purpose this way:

FRE 404(a) states the crucial principle that evidence of the character of a person is generally inadmissible to prove conduct on a particular occasion. There are important exceptions, but the principle applies broadly in both civil and criminal cases. The idea is that character should not be used, for the most part, as circumstantial evidence of behavior. The principle blocks resort to the "general propensity" argument—the argument that since a person is, for instance, by disposition violent, it follows that he likely committed the violent act giving rise to the present charges.

Christopher B. Mueller and Laird C. Kirkpatrick, 1 *Federal Evidence*, § 100, at 539 (2d ed.1994). Justice Jackson more forcefully explained in *Michelson v. United States,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948):

Courts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt. Not that the law invests the defendant

with a presumption of good character, ... but it simply closes the whole matter of character, disposition and reputation on the prosecution's case-in-chief. The state may not show defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.

*Id.,* 335 U.S. at 475–76, 69 S.Ct. at 218–19 (citation and footnotes omitted).

At the outset, we must determine whether separation violence evidence falls within the emerging field of "social framework and syndrome" evidence. In general, BWS and other syndrome evidence is considered a proper subject for expert testimony, and does not implicate the proscription against character evidence. *See* Mueller and Kirkpatrick, 3 *Federal Evidence,* § 351 (2d ed.1994). According to Mueller and Kirkpatrick:

Usually framework and syndrome evidence *is offered by prosecutors and relates to the victim,* as in sexual assault and child abuse trials. But sometimes it is offered by the defense and relates to defendants, as in the setting of homicide trials of women charged with killing husbands or intimate companions. And typical patterns of usage do not always hold true, for defendants sometimes offer evidence that patterns of behavior or attitudes in the alleged victim did not fit the syndrome and *prosecutors sometimes offer evidence of battered women syndrome*

---

of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other pur-

poses, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*in trials of men to explain the victim's behavior.*

*Id.* at 633 (Emphasis added.) When such evidence is raised by the prosecution in its case-in-chief and *relates to the defendant,* however, the testimony "draws close to commenting directly on what likely happened" and "looks like character evidence after all." *Id.* at 637. In such situations, Mueller and Kirkpatrick recognize that:

> The traditional sensitivity accorded to defense rights in criminal cases warrants special care when government experts are talking about the defendant, even if their testimony stops at one remove from direct comments on what the defendant likely did or thought.

*Id.* at 637. Expert testimony on BWS which relates to the victim is entirely proper. Evidence concerning the defendant's involvement, however, demands close scrutiny under the character evidence rules. This is so even if reference to the defendant may only be inferred from the testimony.

Bratton did not say that because Ryan was possessed of a violent character he acted in conformity therewith on the night of the murder. She was more subtle, but the effect was the same. After showing that the subjects of the study tended to commit homicide when faced with the prospect of separation, she impliedly invited the jury to group Ryan among those subjects and by this method determine conduct.

Finding guilt by reference to common characteristics of a class of individuals to which one belongs raises the specter of profile evidence. Profile or syndrome evidence is developed through expert testimony and tends to classify people by their shared physical, emotional, or mental characteristics. *State v. Percy,* 146 Vt. 475, 507 A.2d 955, 960 (1986) (citing 1 J. Weinstein & M. Berger, *Weinstein's Evidence* § 401[10], at 88–91 (1985)). In the context of drug courier profiles, a profile has been characterized as,

> an "informal compilation of characteristics often displayed by those trafficking in

drugs," and as an " 'abstract of characteristics found to be typical of persons transporting illegal drugs.' " Similarly, Chief Justice Rehnquist has described the profile as essentially an investigative tool involving characteristics recognizable to trained officers. "A 'profile' is, in effect the collective or distilled experience of narcotics officers concerning characteristics repeatedly seen in drug smugglers."

*United States v. Quigley,* 890 F.2d 1019, 1021 (8th Cir.1989) (citations omitted), *cert. denied,* 493 U.S. 1091, 110 S.Ct. 1163, 107 L.Ed.2d 1066 (1990). Translated into the battering spouse context, a profile is a compilation of characteristics repeatedly seen in those who batter their spouses.

While our research has not disclosed any case dealing specifically with battering spouses, other jurisdictions in different contexts have dealt with similar attempts to construct a criminal profile for the purpose of proving conduct in conformity therewith. Those jurisdictions that have considered profiles of battering parents, pedophiles, rapists, and drug couriers unanimously agree that the prosecution may not offer such evidence in its case-in-chief as substantive evidence of guilt. These cases generally articulate three evidentiary bases for excluding evidence tending to establish that the defendant fits a particular profile: 1) relevancy; 2) probative value substantially outweighed by prejudicial effect; and 3) impermissible character evidence.

Many courts find profile evidence irrelevant.[4] *Commonwealth v. Day,* 409 Mass. 719, 569 N.E.2d 397 (1991) aptly articulated the reasoning for such a conclusion:

> A criminal trial is by its very nature an individualized adjudication of a defendant's guilt or legal innocence. Testimony regarding a criminal profile is nothing more than an expert's opinion as to certain characteristics which are common to some or most of the individuals who commit particular crimes. Evidence of a "child battering profile" does not meet the relevancy test, because the mere fact that a defen-

---

**4.** W.R.E. 401, provides:
"Relevant evidence" means evidence having any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

dant fits the profile does not tend to prove that a particular defendant physically abused the victim.

*Id.* at 399. *See also, Percy,* 507 A.2d at 960 (Evidence that other rapists often excused or explained their conduct the way the defendant did was not relevant.); *State v. Clements,* 244 Kan. 411, 770 P.2d 447, 454 (1989) (Evidence which only describes the characteristics of the typical offender has no relevance to whether the defendant committed the crime in question.); *United States v. Simpson,* 910 F.2d 154, 157 (4th Cir.1990) (Proof that a person fits the drug courier profile, unsupported by evidence of drug trafficking, proves nothing.); *State v. Maule,* 35 Wash.App. 287, 667 P.2d 96, 99 (1983) (The relevance of testimony that the majority of child abuse cases involved a male parent figure is not readily discernable.); *State v. Brown,* 370 S.2d 547, 552 (La.1979) (Unable to see how evidence of drug courier profile is relevant to any issue of innocence or guilt at the trial on the merits.); *Duley v. State,* 56 Md.App. 275, 467 A.2d 776, 780 (1983) (Evidence of child abuser profile is totally irrelevant because it does not tend to prove that the defendant committed the acts of abuse attributed to him.); *United States v. Hernandez–Cuartas,* 717 F.2d 552, 555 (11th Cir. 1983), *rehearing denied,* 721 F.2d 822 (11th Cir.1983) (Drug courier profile evidence is nothing more than the opinion of those officers conducting an investigation, and it cannot be used as substantive evidence of guilt.); *State v. Hansen,* 304 Or. 169, 743 P.2d 157, 161 (1987) (That child abusers use certain techniques to get near their victims has no bearing on whether a person who does these things is a child abuser.); and *People v. Bradley,* 172 Ill.App.3d 545, 122 Ill.Dec. 523,

526 N.E.2d 916, 921 (1988) (Evidence showing characteristics of child abuse perpetrators was in no way probative or relevant to the question of whether the defendant committed the crime.).

Even assuming that profile testimony is in some degree relevant to the issues at trial, the danger of unfair prejudice to the accused has generally been found to outweigh the probative value.[5] *See Percy,* 507 A.2d at 960–61; *Simpson,* 910 F.2d at 157; *Maule,* 667 P.2d at 99; *Duley,* 467 A.2d at 780; *Brown,* 370 S.2d at 552; *Day,* 569 N.E.2d at 399; *United States v. Jones,* 913 F.2d 174, 177 (4th Cir.1990), *cert. denied,* 498 U.S. 1052, 111 S.Ct. 766, 112 L.Ed.2d 785 (1991); and *Bradley,* 122 Ill.Dec. 523, 526 N.E.2d at 921.

Finally, profile evidence is often found to be an impermissible attack on the defendant's character.[6] *See State v. Hester,* 114 Idaho 688, 760 P.2d 27, 33 (Id.1988); *In the Interest of D.L.,* 401 N.W.2d 201, 203 (Iowa App.1986); *People v. Walkey,* 177 Cal.App.3d 268, 223 Cal.Rptr. 132, 138 (1986); *State v. Loebach,* 310 N.W.2d 58, 62–64 (Minn.1981); *Sanders v. State,* 251 Ga. 70, 303 S.E.2d 13, 18 (1983); *Haakanson v. State,* 760 P.2d 1030, 1035–36 (Alaska 1988); and *Bradley,* 122 Ill.Dec. 523, 526 N.E.2d at 921.

■■■ We hold that the evidence pertaining to separation violence was inadmissable. Our ruling does not, however, proscribe BWS testimony in general, and we reaffirm our prior decisions which have allowed expert testimony to explain the behavior of a battered spouse. *See Trujillo v. State,* 953 P.2d 1182, 1183 (Wyo.1998).

■■■ We must now determine whether the error was harmless.[7] Generally, profile evi-

---

**5.** W.R.E. 403 provides:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

**6.** We additionally note that there is a serious lack of evidence showing that the scientific basis of the expert testimony is in such a state of development so as to permit the expert to make a reasonable opinion about the conduct of batterers in

any given situation. W.R.E. 702. *Sorensen v. State,* 895 P.2d 454, 457 (Wyo.1995) (quoting *Frenzel v. State,* 849 P.2d 741, 747 (Wyo.1993)). *See also Flanagan v. State,* 625 So.2d 827, 828 (Fla.App.1993) (sex offender profile does not meet test established in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923)); and *State v. Steward,* 34 Wash.App. 221, 660 P.2d 278, 280 (1983) (no scientific basis for testimony that live-in or babysitting boyfriends are likely to abuse children).

**7.** Several courts have found similar testimony to be improper, but harmless, where there was substantial evidence of guilt. *In the Interest of D.L.,*

dence consists of a compilation of otherwise innocent characteristics, coupled with an implicit invitation to infer criminal conduct from those characteristics. In the present case, however, the characteristics of the profile consist of prior bad acts, which have independent evidentiary significance. That is, they tend to prove motive, intent, and identity.

Aside from the formidable body of prior bad acts evidence, there was substantial physical evidence indicating Ryan's guilt. Keri was killed while lying prone on the bed. Her body was moved and the gun placed under her hand after she was shot. There was no evidence of struggle or suicide. After shooting Keri, Ryan admittedly shot himself and called 911, but it was his, rather than Keri's, impending demise that prompted the call.

The objectionable statements consist of two short answers made during more than a week of testimony, and the prosecutor only briefly discussed the testimony in closing argument. Where, as here, there is substantial evidence of guilt, and the State has not unduly emphasized the objectionable testimony, we cannot say that there is a reasonable probability that the result would have been more favorable to Ryan had the error never occurred. The error was harmless.

## 2. TESTIMONY OF STEPHANIE RYAN

Ryan also claimed in a pretrial motion that Stephanie Ryan (Stephanie), his five-year-old daughter, was incompetent to testify. Stephanie inaccurately stated during her deposition that she heard her mother say "Please don't kill me" when the police were in the trailer. As Keri was dead at the time the officers arrived, this statement was verifiably inaccurate. Additionally, Ryan claimed that Keri's parents, who took custody of the children after the shootings, bore undisputed malice toward Ryan and had influenced Stephanie's proposed testimony. The trial judge read Stephanie's deposition and found that while there were some inconsistencies in the child's testimony, she was competent to testify.

401 N.W.2d 201; *Quigley,* 890 F.2d 1019; *Walkey,* 177 Cal.App.3d 268, 223 Cal.Rptr. 132; *Loe-*

At trial, Stephanie demonstrated that she knew her birthday, her age, where she went to school, her address, her telephone number, and the names and ages of the people and animals with whom she lived. She remembered that she used to live in Green River in a trailer with her parents. She remembered her teacher and fellow students from her time in school in Green River. She stated that she knew the difference between the truth and a lie and gave examples of each. She also stated that she understood the oath to be a promise to God.

Stephanie then testified that on December 11, 1996, her parents had been fighting throughout the day. She remembered that her mother made her Spaghettios for dinner. She testified that Ryan telephoned his employer and stated that he could not come to work that evening. This testimony was corroborated by Ryan's employer. Stephanie then testified that she heard Ryan say, "We're going to work this out until we both die." At some point later in the evening, Stephanie also heard Keri say, "Please don't kill me." Consistent with her deposition testimony, Stephanie stated that officers were present when she heard her mother beg for her life. The State also presented testimony from Keri's parents and a counselor from Southwest Counseling Service who interviewed Stephanie in April of 1997, which showed that Stephanie's testimony had remained consistent throughout the period between the shootings and trial.

■ The competency of child witnesses is determined by the application of a five-part test. The child must demonstrate:

(1) an understanding of the obligation to speak the truth on the witness stand; (2) the mental capacity at the time of the occurrence concerning which he is to testify, to receive an accurate impression of it; (3) a memory sufficient to retain an independent recollection of the occurrence; (4) the capacity to express in words his memory of the occurrence; and (5) the capacity to understand simple questions about it.

*bach,* 310 N.W.2d 58; *Sanders,* 303 S.E.2d 13 at 18.

*English v. State,* 982 P.2d 139, 145 (Wyo. 1999), (quoting *Larsen v. State,* 686 P.2d 583, 585 (Wyo.1984)). Moreover, we have said that, "Intelligence, not age, is the guiding criteria in determining the competency of a witness." *Id.* (quoting *Baum v. State,* 745 P.2d 877, 879 (Wyo.1987)).

 Stephanie demonstrated an understanding of the obligation to speak the truth by her statement that the oath was a promise to God. The accuracy with which she recalled the verifiable details about the night her mother was shot demonstrates that she had sufficient mental capacity to receive an accurate impression of the event. That Stephanie's memory proved fallible on one point does not demonstrate the absence of an independent recollection. Her memory of the event as a whole must be considered in ascertaining whether she actually had an independent recollection of the events. Clearly, she did. Her recitation of the events to which she was privy on that night has not changed since her initial interview, and much of her testimony has been corroborated without her knowledge. There is no question that Stephanie has been able to communicate what she recalled and to understand simple questions about the event.

Regarding Ryan's claims that Stephanie has been tainted by her grandparents, we find no evidence supporting such a claim. Recently, in *English, supra,* we stated that a party claiming that a child's testimony has been tainted by improper influences must show "some evidence" of improper influence before a competency hearing is necessary. *English,* 982 P.2d at 146. Ryan has failed to present any evidence that Stephanie's maternal grandparents, the prosecution, or anyone else, influenced her testimony by either undue suggestiveness or outright coercion.

We find that the district court's determination that Stephanie was competent to testify was proper.

### 3. TESTIMONY OF JEANETTE HOPKINS

Jeanette Hopkins (Hopkins), who had been Keri's friend since high school, had witnessed Ryan abuse and control Keri several times. The State notified defense counsel in a pre-trial motion of its intent to present testimony via video teleconference because Hopkins, a resident of Georgia, was in the midst of a high risk pregnancy and had been advised by her doctor not to travel. Before Hopkins testified, the trial judge advised defense counsel that there is usually a delay inherent in teleconferences and defense counsel should view the procedure himself prior to Hopkins' testimony. Counsel did not avail himself of this opportunity.

The Hopkins testimony was transmitted to Western Wyoming Community College, and the jury was seated before the receiving unit. Before testifying, Hopkins was sworn in Georgia. Hopkins testified about instances of abuse that she witnessed between Ryan and Keri, and only after the jury was removed from the teleconference facility did defense counsel move that all of Hopkins' testimony be stricken. Defense counsel asserted that he could not view her demeanor, and that she could not see Ryan, except for the moment when defense counsel stated that he had no questions. Defense counsel argued that the inability of the jury to assess Hopkins' credibility and her inability to see Ryan violated his right to confrontation. The trial judge stated:

> I will agree with you, [defense counsel], that the three images that we saw, the images of the Green River audience and the attorneys speaking was of one quality. In between was the image from the—the [operator] in [Cheyenne].
>
> . . . .
>
> Okay. That was an in-between quality that did have a delayed image, but it was of a better quality picture, I felt, and then the third image, which was of a third quality was the image of the—the witness, Ms. Hopkins, who was testifying. I do not believe that this deprived the Defendant of his right of confrontation, and so I'm denying your motion.

 The Sixth Amendment to the United States Constitution and Article 1, § 10, of the Wyoming Constitution secure to all criminal defendants the right "to be confronted with the witnesses against him." The right to confrontation:

"(1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the 'greatest legal engine ever invented for the discovery of truth'; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility."

*California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (footnote omitted). Thus, the right to confrontation primarily secures the reliability of the evidence offered by the State. *Maryland v. Craig,* 497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

While it has been broadly stated that the confrontation clause of the Sixth Amendment "guarantees the defendant a face-to-face meeting with witnesses appearing before the trier of fact," *Coy v. Iowa,* 487 U.S. 1012, 1016, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988), it is generally accepted that the confrontation clause actually "reflects a *preference* for face-to-face confrontation at trial." *Craig,* 497 U.S. at 849, 110 S.Ct. 3157 (quoting *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980)) (emphasis in original). The preference "must occasionally give way to considerations of public policy and the necessities of the case." *Mattox v. United States,* 156 U.S. 237, 243, 15 S.Ct. 337, 39 L.Ed. 409 (1895). Where the reliability of the testimony is otherwise assured or an important public policy will be furthered, a criminal defendant may be denied the right to confrontation. *Craig,* 497 U.S. at 850, 110 S.Ct. 3157.

In the present case, Ryan asserts that the State did not show that denial of a face-to-face confrontation furthered an important public policy, or that the reliability of the testimony was otherwise assured by circumstantial guarantees of trustworthiness; therefore, he was entitled to a face-to-face confrontation. We agree. Ryan does not, however, assert that had the technology worked perfectly, he would have been denied the functional equivalent of a face-to-face confrontation. Therefore, the question presented is whether poor picture quality can eviscerate the face-to-face character of teleconference technology and, if so, whether such was the case here.

In *Commonwealth v. Bergstrom,* 402 Mass. 534, 524 N.E.2d 366 (1988), the court found that the quality of videotaped testimony was insufficient to allow the jury to properly fulfill its responsibilities. After reviewing the tapes, the court said,

> Many of the technical aspects of these videotapes are troublesome. The color and sound were not true.... The court reporter, who watched the jury's monitor, at times had difficulty hearing the proceedings, as did we. At one point, the screen went blank. Sounds that ordinarily would be minor background noises—such as a truck passing outside, or one of the attorneys ripping a piece of paper from a pad—when carried over the audio portion of the transmission were highly magnified and distracting. Often the child [witness] would play with the microphone wire, creating very loud crackling noises that interfered with both sound and concentration. Due to the camera angle, throughout much of the first child's appearance her right hand fully or partially obscured her face; at times, when she leaned back in the chair, her face was nearly out of camera range. The electronic techniques that were used showed neither the face of the judge presiding nor the image of the attorneys. The disembodied voices of the participants in the interrogations were transmitted. Also, unidentified persons were seen on the screen without explanation.

*Id.* at 375. The court went on to conclude that the videotaped testimony was not equivalent to personal observation by the jury.

There is a point where insufficient technology can jeopardize substantive rights. That point, however, is not readily ascertainable from the cold record. Whether testimony taken by electronic means sufficiently allows the jury to measure the witness' demeanor and provides face-to-face confrontation between the accused and the accuser lies within the sound discretion of the trial court.

The trial judge witnessed Hopkins' testimony, and determined that, while the picture was not perfect, it did not deprive Ryan of his right to confrontation. There was no objection to the quality of the sound, and no one complained that they could not hear the testimony. Moreover, Hopkins' testimony was merely cumulative of other prior bad acts evidence. The district court properly denied the motion to strike Hopkins' testimony.

## 4. SECOND SEARCH WARRANT

■ In a motion for discovery the State requested access to the trailer so that its out-of-state expert witness could examine it. In response, defense counsel stated, "Well, I think that that needs to be dealt with as a search warrant. I'm not consenting." The court and counsel then discussed whether the district court had authority to grant permission to the State to enter without a search warrant. Neither party produced any pertinent authority on the question, and the matter was left with the understanding that if "there's a legal basis for [the district court] to issue an order without a warrant or remove a warrant, [the State will] approach it that way, let [defense counsel] know it's coming, and if not, [the State will] do a search warrant." Ultimately, the State did seek and was issued a search warrant from the county court. Ryan moved to suppress any evidence obtained from the search, and that motion was denied.

■ Ryan contends that the county court was without jurisdiction to issue the search warrant, as the case had been transferred to the district court pursuant to W.R.Cr.P. 5.1 [8] Additionally, Ryan asserts that once a case

has been transferred to the district court, that court has exclusive jurisdiction to manage discovery, pursuant to W.R.Cr.P. 16. The State responds that Wyo. Stat. Ann. § 7-7-101,[9] which authorizes county court judges to issue warrants, is controlling.

The authority of the county court to issue a search warrant is statutory and cannot be abrogated or altered by court rule. Pursuant to Wyo. Stat. Ann. § 5-2-114 (LEXIS 1999):

> The supreme court of Wyoming may from time to time adopt, modify and repeal general rules and forms governing pleading, practice and procedure, in all courts of this state, for the purpose of promoting the speedy and efficient determination of litigation upon its merits.

However,

> (b) Such rules shall neither abridge, enlarge nor modify the substantive rights of any person nor the jurisdiction of any of the courts nor change the provisions of any statute of limitations.

Wyo. Stat. Ann. § 5-2-115(b) (LEXIS 1999). Therefore, county courts cannot be divested of their authority to issue a search warrant by W.R.Cr.P. 5.1.

■ Ryan correctly notes that the district court has exclusive jurisdiction to control discovery. Pursuant to that authority, the court "may at any time order that the discovery or inspection be denied, restricted, or deferred, or make such other order as is appropriate." W.R.Cr.P. 16(d)(1). Therefore, while the district court has no power to prevent the issuance of a warrant from the county court, it does have the authority to

---

**8.** W.R.Cr.P. 5.1 provides in pertinent part:
> (a) *Right.*—... If the preliminary examination is waived, the case shall be transferred to district court for further proceedings.
> (b) *Probable cause finding.*—If from the evidence it appears that there is probable cause to believe that the charged offense or lesser included offense has been committed and that the defendant committed it, the judicial officer shall enter an order so finding and the case shall be transferred to the district court for further proceedings.

**9.** Wyo. Stat. Ann. § 7-7-101 (LEXIS 1999) provides in pertinent part:

> (a) Any district judge, district court commissioner, county judge, county court commissioner, adjunct county court commissioner authorized pursuant to W.S. 5-5-167(e)(iii) or any justice of the peace may issue a search warrant to search for and seize any property:
> ....
> (iv) When the property or things to be seized consist of any item, or constitute any evidence which tends to show a crime has been committed, or tends to show that a particular person has committed a crime.

prevent the litigants before it from seeking a search warrant, or, pursuant to W.R.Cr.P. 16(d)(2), from using evidence obtained thereby at trial. In the absence of such an order directing discovery, however, litigants are free to pursue any authorized avenue of discovery available to them.

There has been no contention that the warrant was not supported by probable cause, that Ryan's right to be free from unreasonable searches and seizures has been violated, or that the district court abused its discretion in admitting the evidence. Therefore, we find that admission of the evidence obtained by the second search warrant was proper.

## B. STATEMENTS TO THE JURY

### 1. TRIAL JUDGE'S STATEMENT

■ Defense counsel inquired extensively about spousal abuse during voir dire in an effort to ferret out jurors who could not judge the case on the evidence presented because Ryan had abused his wife. At one point, defense counsel attempted to challenge a potential juror for cause because she admitted that she had strong feelings about spousal abuse. In response to the challenge for cause, the trial judge stated:

> Well, [defense counsel], what I've heard her say is that she is not for spousal or domestic abuse. That is a criminal act. I think if you ask all these people, "Do you have strong feelings about murder", they would probably say, "Yes". That does not disqualify them from serving on this jury. I think it's important they be able to separate, perhaps, the two, that Mr. Ryan is here not because he hit his wife, but because he murdered his wife, and whether or not they have strong feelings about domestic violence or hitting their wives, that isn't going to disqualify them from serving on this jury.

During the next in-chambers conference, defense counsel moved for a mistrial asserting that the statement tainted the entire jury panel. The motion was denied, and the trial judge gave the following curative instruction upon returning to the courtroom:

> Ladies and gentlemen, the attorneys have pointed out to me that I said that "Mr. Ryan is here not because he hit his wife, but because he murdered his wife." I should have said, "He's not here because he's charged with hitting his wife, he's here because he is charged with having murdered her." I did not intend to imply that the Court has any opinion as to guilt or innocence of the defendant. In fact, the Defendant is presumed to be innocent, and the burden of proof is on the State to prove that he's guilty beyond a reasonable doubt, and what the Court thinks about guilt or innocence, if anything, is irrelevant because that is the decision for the jury alone.

We have stated that:

> [T]he trial judge must "'be careful and cautious and not comment on the evidence.'" *Phillips v. State*, 597 P.2d 456, 458 (Wyo.1979) (quoting *Peterson v. McMicken (Nelson's Estate)*, 72 Wyo. 444, 499, 266 P.2d 238, 261 (1954)). In a trial before a jury, the trial judge must abstain from expressing or indicating, by word, deed, or otherwise, his personal feelings on the weight or quality of the evidence. *Id.* Comments or expressions of opinion on the evidence which have the tendency to indicate bias on the trial judge's part are regarded as being an infringement on the jury's duties and are prejudicial to the defendant. *Id.*

*Harris v. State*, 933 P.2d 1114, 1118 (Wyo. 1997).

■ Ryan asserts that the trial judge's comment rises to the level of error per se. We disagree. More than a mere misstatement is necessary to show that the trial judge improperly expressed his opinion on the evidence. Moreover, the curative instruction alleviated any possible prejudice to Ryan.

### 2. STATEMENTS DIRECTED TO THE JURY OUTSIDE THE TRIAL

■ In the middle of the trial, while leaving the courthouse for the night, one of the jurors heard an unidentified male say, "We know who they are now, and they better find him innocent." The juror was certain that

the statement was not made by Ryan, his father, or his brother. She told another juror about the incident immediately thereafter, and the next morning she told the other jurors in an effort to ascertain whether it was something that ought to be brought to the bailiff's attention.

Upon learning of the comment, the trial judge and counsel asked the juror whether she felt any animosity toward the defendant, whether she could continue to be fair, and whether she felt intimidated by the comment. She indicated that she did not blame Ryan for the comments of others, that the incident would not affect her ability to be fair, and that she did not feel intimidated. Defense counsel immediately moved for a mistrial. The trial judge instead brought each juror into chambers and asked them what they knew about the incident, whether it would affect their ability to be fair, and whether they felt intimidated. Each responded that they could continue to be fair and that they did not feel intimidated. Additionally, the judge made sure that each juror was aware that the statement was not made by Ryan, his father, or his brother. Given these assurances, the motion for mistrial was denied.

■ During deliberations, members of the jury who smoked were permitted to go to a common area outside of the courthouse. While one of the jurors was in this common area, in the company of a bailiff, a courthouse security guard approached the juror and asked, "[I]f they were even close, and he said no, and that was it." Defense counsel moved for a mistrial, asserting that, "[I]mplicit in that communication is, 'Hey, you know, the guy's guilty as hell, and let's just get this over with so we can all go home.'" The district judge disagreed and denied the motion, finding that such an innocuous comment was not prejudicial.

■ As early as 1910 we made known that communications between jurors and third parties were improper. In *Nicholson v. State*, 18 Wyo. 298, 106 P. 929 (1910), we said,

> that when a defendant in a capital case has shown a separation of the jury, or an opportunity for other parties, and especially

witnesses, to communicate with them in violation of the statute, and it appears that defendant was prejudiced, or that it does not appear that he was not prejudiced thereby, a new trial should be granted.

*Id.* at 932. This rule has generally been viewed as establishing that improper communications are presumptively prejudicial to the defendant. *Romo v. State*, 500 P.2d 678, 681–82 (Wyo.1972). Of course, where the content of the improper communications can be proven, measurement of its prejudicial effect lies within the sound discretion of the district court. *See State v. Goettina*, 61 Wyo. 420, 158 P.2d 865, 886 (1945) (" * * * The trial court had the right, we think, to conclude from the affidavits that Tom Lavery [the deputy sheriff] did not discuss with the jurors anything relating to the case, and, hence, we must conclude that no ground for a new trial has been shown.").

Here, the district court found that the first comment, although potentially troubling, was generally ignored by the jurors, and he was assured that it would not have any bearing on their verdict. The court found the second comment to be improper but harmless small talk. Without further evidence establishing actual prejudice, we cannot say that the district court improperly denied the motions for mistrial.

## C. IMPOSITION OF LIFE SENTENCE WITHOUT MINIMUM TERM

■ Ryan was sentenced to serve the remainder of his natural life in prison; a sentence authorized by Wyo. Stat. Ann. § 6–2–104. No minimum term was established by the district court. Ryan contends that the court was prohibited from imposing a definite term, and that a minimum term must be established.

■ "An illegal sentence is one which exceeds statutory limits, imposes multiple terms of imprisonment for the same offense, or otherwise violates constitutions or the law." *Sanchez v. State*, 982 P.2d 149, 150 (Wyo.1999) (citing *Duran v. State*, 949 P.2d 885, 887 (Wyo.1997)). The determination of whether a sentence is illegal is made by reference to the authorizing statute or applicable constitutional provisions and is, there-

fore, a matter of statutory interpretation. Interpretation of statutes is a question of law, which we review *de novo*. *French v. Amax Coal West*, 960 P.2d 1023, 1027 (Wyo. 1998); *Chevron U.S.A., Inc. v. State*, 918 P.2d 980, 983 (Wyo.1996).

■ Statutory interpretation begins by looking at the plain and ordinary meaning of the language of the statute to determine whether it is ambiguous. *Bolack v. Chevron U.S.A., Inc.*, 963 P.2d 237, 240–41 (Wyo. 1998); *Parker Land and Cattle Company v. Wyoming Game and Fish Commission*, 845 P.2d 1040, 1042–43 (Wyo.1993).

> A "statute is unambiguous if its wording is such that reasonable persons are able to agree as to its meaning with consistence and predictability." "[A] statute is ambiguous only if it is found to be vague or uncertain and subject to varying interpretations." "[W]hether an ambiguity exists in a statute is a matter of law to be determined by the court."

*Bolack*, 963 P.2d at 241 (citations omitted), *Parker Land and Cattle Company*, 845 P.2d at 1043 (quoting *Allied–Signal, Inc. v. Wyoming State Board of Equalization*, 813 P.2d 214, 219–20 (Wyo.1991)). If a statute's meaning is plain, we apply it without further inquiry. *Id.* If we determine, however, that a statute is ambiguous, we will consider extrinsic evidence in our attempt to ascertain legislative intent. *Parker Land and Cattle Company*, 845 P.2d at 1044.

> [I]n ascertaining the legislative intent in enacting a statute * * * [we] * * * must look to the mischief the act was intended to cure, the historical setting surrounding its enactment, the public policy of the state, the conditions of the law and all other prior and contemporaneous facts and circumstances that would enable the court intelligently to determine the intention of the lawmaking body.

*Id.* (quoting *Carter v. Thompson Realty Company*, 58 Wyo. 279, 291, 131 P.2d 297, 299 (1942)).

Ryan contends that Wyo. Stat. Ann. § 7–13–201 requires that the district court establish a maximum and minimum term in all felony cases where a life sentence is not mandatory. Wyo. Stat. Ann. § 7–13–201 (LEXIS 1999) provides:

> Except where a term of life is required by law, or as otherwise provided by W.S. § 7–13–101, when a person is sentenced for the commission of a felony, the court imposing the sentence shall not fix a definite term of imprisonment but shall establish a maximum and minimum term within the limits authorized for the statute violated. The maximum term shall not be greater than the maximum provided by law for the statute violated, and the minimum term shall not be less than the minimum provided by law for the statute violated, nor greater than ninety percent (90%) of the maximum term imposed.

The statute obviously breaks down where, as here, a life sentence is authorized by the statute, but not required. As it is not required, the district court appears to be compelled to establish a minimum term which is no more than 90% of the life sentence. We cannot envision the mathematics involved in such a calculation.

An early predecessor to Wyo. Stat. Ann. § 7–13–201 provided:

> When a convict is sentenced to the state penitentiary, otherwise than for life, for an offense or crime, the court imposing the sentence shall not fix a definite term of imprisonment, but shall establish a maximum or minimum term for which said convict shall be held in said prison. The maximum term shall not be longer than the longest term fixed by law for the punishment of the offense of which he was convicted, and the minimum term shall not be less than the shortest term fixed by law for the punishment of the offense of which he was convicted.

Wyo. Stat. Ann. § 7–313 (Michie 1957). We held in *Jaramillo v. State*, 517 P.2d 490 (Wyo.1974), and *Dolence v. State*, 921 P.2d 1103 (Wyo.1996), that the requirement for setting maximum and minimum terms did not apply to life sentences because Wyo. Stat. Ann. § 7–313 applied to sentences "otherwise than for life." *Jaramillo*, 517 P.2d at 492; *Dolence*, 921 P.2d at 1104.

In 1986 we were called upon to decide whether a difference of a single day between

the maximum and minimum terms was proper under the statute. We concluded that it was:

> [T]here is nothing in the statute which requires any fixed period of time between the minimum and maximum, and this court would be interfering with an important legislative function if it undertook to establish such a period. We doubt that the legislature overlooked the obvious possibility that a judge might impose the sentences imposed here. Justice Brown, in a concurring opinion in *Jahnke v. State*, Wyo., 682 P.2d 991, 1010–1011 (1984), noted that such sentences would be possible under the statute. He stated that the judge in that case "could have sentenced Richard [Jahnke] to not less than nineteen years, eleven months and twenty-nine days." The legislature has not amended the statute in response to Justice Brown's observation.

*Duffy v. State*, 730 P.2d 754, 756 (Wyo.1986).

The legislature took notice of *Duffy* and in the next legislative session changed Wyo. Stat. Ann. § 7–13–201 into its present form. From the timing of the amendment, we conclude that the legislature intended to address Justice Brown's concerns. The preamble to the applicable session law also reflects that the statute was being amended to provide "that in imposing an indeterminate sentence in a felony case the court shall set the minimum term at no more than 90% of the maximum term imposed." 1987 Wyo. Sess. Laws, Ch. 157.

■ As we find no indication that the legislature intended to abrogate the holdings in *Jaramillo* and *Dolence*, we interpret the statute to mean that the district court is not required to establish a minimum term where a life sentence is imposed but was not required by statute. We are mindful of the rule of statutory construction which provides that if the legislature deletes an express provision in a statute, it must have meant to change the law in some way. *Nylen v. Dayton*, 770 P.2d 1112, 1116 (Wyo.1989). An opposite interpretation of the statute, however, would not only fail to cure the ambiguity in Wyo. Stat. Ann. § 7–13–201, but would also effectively abrogate the permissive life

sentence provision in the second degree murder statute. We must assume that the legislature did not intend for us to interpret Wyo. Stat. Ann. § 7–13–201 in a manner which produces that result. Ryan's sentence was not illegal.

## IV. CONCLUSION

Of Ryan's eight asserted errors, we find only one meritorious, and hold that the objectionable portions of Bratton's testimony dealing with separation violence were improperly admitted. We affirm only because the conviction is founded upon otherwise compelling evidence.

GOLDEN, Justice, specially concurring and dissenting, with whom THOMAS, Justice, joins.

Although I concur in the majority's affirmance of Ryan's conviction, I disagree with its treatment of the issue entitled "Separation Violence—The Bratton Testimony." The majority holds that two short objectionable answers in Bratton's testimony pertaining to separation violence were inadmissible and the trial court's ruling to the contrary was error, albeit harmless. The majority apparently finds that these two short answers in Bratton's "separation violence" testimony tended to establish that Ryan fit a particular profile, e.g., spouse batterer. And, apparently, the majority holds that such "profile evidence" violates W.R.E. 404(a) which proscribes admissibility of evidence of a person's character trait for the purpose of proving that he acted in conformity therewith on a particular occasion.

In my judgment, on this record, the trial judge did not abuse his discretion when he denied trial defense counsel's motion in limine and allowed Bratton's testimony. As I read the record, trial defense counsel was only concerned that Bratton's testimony would be in the form of opinions "concerning what the defendant might have done or might not have done...." In particular, at the motion hearing on February 19, 1998, trial defense counsel objected to "opinions concerning how Roy Ryan would have acted under the circumstances that existed at the

time of the shooting, ... that [Bratton] may well say that because he was [an abuser] ... and this was an abused spousal syndrome case, that he would become more frantic when his wife left, ... that things got out of control would have propelled him towards violence, and in fact, that's exactly what happened. He shot his wife as a result of this whole spousal syndrome issue...."

Responding to trial defense counsel's concern, the prosecutor assured him and the trial judge that Bratton would not express opinions that either Ryan or his wife would behave a certain way. Instead, the prosecutor stated that he was relying on that part of W.R.E. 702 that permits an expert's testimony to "assist the trier of fact to understand the evidence." He explained that Bratton would testify in general terms about her area of expertise, including the actions of an abused spousal victim and the reactions of the abuser. He explained that Bratton's testimony providing general context or framework would assist the jury to understand the W.R.E. 404(b) evidence which the trial court had ruled admissible. In passing, it must be noted that Ryan has not raised any W.R.E. 404(b) issue on appeal. Referring to Professors Mueller and Kirkpatrick's evidence treatise, Section 351, pages 632–634, 637–639 (1994), which treats the admissibility of expert testimony describing social frameworks, the prosecutor made a strong case for the admissibility of Bratton's general context or framework testimony. According to Professors Mueller and Kirkpatrick, expert testimony relating to social frameworks describes "patterns of human behavior and mental attitudes, typically in persons who have experienced various kinds of psychological stress arising out of particular experiences, usually relating to sexual or physical abuse...." 3 Christopher B. Mueller and Laird C. Kirkpatrick, *Federal Evidence*, § 351, at 632 (2d ed.1994). They explain that "[t]he term 'framework' ... relates to social or familial settings similar to those in which the events in suit occurred but rests largely on case studies unrelated to those events. In other criminal settings, something very like framework evidence has been admitted for years." *Id.* For example, experienced law enforcement agents often describe patterns of organizational behavior, bookkeeping, and jargon in trials for crimes such as drug trafficking, gambling, and interstate prostitution. *Id.* at 632 n. 2. Refuting the claim that framework evidence is inadmissible character evidence, they explain

Despite the obvious affinity with character evidence, the argument seems powerful that the very qualities that separate expert framework and syndrome testimony from conventional character evidence mean that such evidence, properly handled, need not be classified wholesale as proof of character. Instead it can be viewed as evidence of psychological condition or capacity and as a general account of human dynamics. After all, much of the explanatory force comes from models or studies of human behavior, rather than appraising personal qualities innate in the subject. The indicated conclusion is that such evidence, properly handled, is dissimilar enough from character evidence to remove it from control of FRE 404, FRE 405, and FRE 608.

*Id.* at 636.

The prosecutors here properly handled Bratton's framework testimony. They specifically avoided having Bratton testify whether Roy Ryan was a battering spouse and his wife a battered spouse; they specifically avoided having Bratton testify about what she thought happened, or that either Roy Ryan or his wife behaved a certain way. Bratton offered no such opinions or conclusions. In my judgment, the trial judge and the prosecutor handled the Bratton testimony correctly. There was no error.

THOMAS, Justice, specially concurring and dissenting, with whom GOLDEN, Justice, joins.

I also agree that Ryan's conviction should be affirmed, and I join in the concurring and dissenting opinion of Justice Golden. In addition to the discerning analysis presented by Justice Golden, I believe that we have cases in Wyoming that justify the exercise of discretion by the trial court in admitting the Bratton testimony. The jury was confronted by events that seemed difficult to reconcile.

In my judgment, the Bratton testimony was useful to the jury in its duty to determine the facts in this case.

I have analyzed the matter from a different perspective than Justice Golden. I agree that we should not treat Bratton's testimony as character evidence under W.R.E. 404. For me, the W.R.E. 404 issue would relate only to the evidence of spousal abuse that was presented by other witnesses. Ryan did not contest the admissibility of that evidence. The admissibility of Bratton's testimony then should be evaluated under W.R.E. 702 and W.R.E. 703.

These rules obviously raise far different questions than the question of character evidence. The primary concern in the exercise of the trial court's discretion is whether the expert will assist the trier of fact to understand the evidence or to determine a fact in issue. This determination presupposes the determination of relevance under W.R.E. 401, and then invokes the weighing requirements of W.R.E. 403. In this case, the issue at the trial, as I understand the case, was who shot whom. This evidence was definitely useful to the jury in deciding whether Ryan had shot the victim and then shot himself, or, alternatively, whether the victim first wounded Ryan who then killed her in protecting himself.

While factually distinguishable, language that we invoked in *Coleman v. State*, 741 P.2d 99, 105 (Wyo.1987), may well have been prophetic:

It was offered for a permissible purpose to show motive, the state of mind of Coleman, intent, purpose, and a continuing course of conduct. It was material because evidence of motive can lead to an inference of identity which is an element of this crime. That concept is appropriately stated in J. Weinstein and M. Berger, 2 Weinstein's Evidence, supra, § 404[14] at 404–108:

"Motive has been defined as 'supply[ing] the reason that nudges the will and prods the mind to indulge the criminal intent.' Two evidentiary steps are involved. Evidence of other crimes is admitted to show that defendant has a reason for having the requisite state of mind to do the act charged, and from this mental state it is inferred that he did commit the act." (Footnotes omitted.)

In *Marker v. State*, 748 P.2d 295, 297 (Wyo.1988), after quoting the above language from *Coleman,* we went on to adopt the following language:

Wright and Graham, Federal Practice and Procedure: Evidence § 5239, pp. 465–466 (1978) states:

"The exception [for proof of identity] is usually thought of as involving evidence of a method of committing crimes that is so distinctive as to constitute a 'signature' of the culprit. But this is only one way in which evidence of other crimes may serve to identify the actor. *Identity may also be shown when the other crime establishes that the defendant is one of a limited class of persons with the capacity to commit the crime* \* \* \*."

(Emphasis added.) In *Kolb v. State*, 930 P.2d 1238, 1242 (Wyo.1996), we said:

The admissibility of such testimony is a function of helping the jury understand how particular conduct by the accused or an alleged victim can be viewed as part of a greater pattern of behavior, rather than as an isolated event.

I am convinced that is exactly why the trial court committed no error in admitting the Bratton testimony. Viewed as an isolated event, the circumstances could be perceived as nothing more than a tragic accident. When Ryan's conduct and that of the victim are viewed in the "greater pattern of behavior," however, it is much easier to understand what was going on that resulted in the death of the victim and the wounding of Ryan.

I would hold that there was no error, not that error occurred but was harmless.